

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-28-2008

# Morales v. Sun Constructors Inc

Precedential or Non-Precedential: Precedential

Docket No. 07-3806

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Morales v. Sun Constructors Inc" (2008). *2008 Decisions.* Paper 569.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/569

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3806
_____

JUAN MORALES

v.

SUN CONSTRUCTORS, INC.,

Appellant.


_____

Appeal from the District Court
of the Virgin Islands
(No. 07-cv-00005)

District Judge:  Honorable Raymond L. Finch

Argued May 6, 2008

Before: RENDELL, FUENTES, and CHAGARES, <u>Circuit
Judges</u>.


_____

(Filed: August 28, 2008)


Charles E. Engeman (Argued)
Fermín E. Fontanés Gómez
Ogletree, Deakins, Nash, Smoak & Stewart, LLC
The Tunick Building, Suite 201
1336 Beltjen Road
St. Thomas, Virgin Islands 00802

Counsel for Appellant

Emile A. Henderson III (Argued)
Law Offices of Yvette D. Ross-Edwards
115 Queen Street
Frederiksted, St. Croix
U.S. Virgin Islands 00840

Counsel for Appellee


OPINION OF THE COURT

CHAGARES, <u>Circuit</u> <u>Judge</u>.

This case requires us to determine whether an arbitration clause in an employment agreement is enforceable where one party is ignorant of the language in which the agreement is written.

Juan Morales (Morales) was employed by Sun Constructors, Inc. (Sun). The employment relationship between Morales and Sun was governed by a signed employment agreement (the Agreement) that contained an arbitration clause. Morales was terminated by Sun, and he filed a wrongful termination suit against his former employer in the District Court of the Virgin Islands. Sun moved to stay the proceedings pending arbitration, but the District Court denied the motion, finding that Morales signed the Agreement without realizing it contained an arbitration clause. The Agreement was written in English, a language Morales cannot understand, and the District Court concluded that the arbitration clause was unenforceable because Morales did not assent to the clause. On appeal, Sun argues that Morales is bound by the entire Agreement, even if he is ignorant of its terms. We agree and will reverse the decision of the District Court and remand the case with instructions to enter a stay pending arbitration.

I.

Appellee Morales is a Spanish-speaking welder who resides in St. Croix, United States Virgin Islands. Welders like Morales

2

were in high demand by appellant Sun, and Morales acknowledged: "[Sun] needed me. It was an emergency . . . .They needed to start work, so they were under pressure." Appendix (App.) 114, 121. On April 15, 2004, after Morales had passed a written exam, in English, Sun hired him and required him to attend a 2 1/2-hour orientation conducted entirely in English and to sign an hourly employment agreement. Five paragraphs of the Agreement (paragraphs 12 through 16) pertained to arbitration and covered nearly 8 of the 13 pages of the Agreement. App. 126-38. The Sun employee who conducted the orientation, Mr. Langner, asked Jose Hodge (Hodge), a bilingual applicant who was also present at the orientation, and whom Morales knew, to explain to Morales what Langner was saying and help him fill out the documents. App 83, 69. Hodge testified that he generally understands about eighty-five percent of what is said and written in English. App. 94. He also stated that Morales did not ask him what he was signing and that he did not specifically explain the arbitration clause to Morales. App. 69, 94. Mr. Langner stated that he did explain the arbitration provisions in English and that, during the orientation, Hodge was speaking to Morales in a foreign language. App. 82-83. The Agreement governed the employment relationship between Morales and Sun for the entirety of the relationship.

On April 6, 2005, Sun fired Morales for allegedly dumping a bottle of urine from a great height on another contractor's employees in violation of safety standards. Morales filed a wrongful termination suit against Sun in the District Court on December 20, 2006, seeking relief under eight causes of action all covered by the Agreement's arbitration clause. The District Court determined that mutual assent to the arbitration clause did not exist and denied Sun's motion to stay the proceedings pending arbitration. This appeal followed.

II.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 9 U.S.C. § 16 and exercise plenary review over the District Court's denial of Sun's motion to stay proceedings pending arbitration. To the extent that the District Court based its decision on findings of fact, however, we review for clear error. See

Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 53-54 (3d Cir. 2001).

## III.

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, provides that arbitration agreements are "enforceable to the same extent as other contracts," and "establishes a strong federal policy in favor of the resolution of disputes through arbitration." Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 263 (3d Cir. 2003) (quotation marks and citation omitted). However, "arbitration provisions may be attacked under 'such grounds as exist at law or in equity for the revocation of a contract.'" Plaskett v. Bechtel Int'l, Inc., 243 F. Supp. 2d 334, 339 (D.V.I. 2003) (quoting 9 U.S.C. § 2).

When determining "whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). In the absence of contrary Virgin Islands law, this case is governed by the rules of the common law, as expressed in the restatements of law approved by the American Law Institute. See 1 V.I. Code Ann. § 4 (2007); Barclays Invs., Inc. v. St. Croix Estates, 399 F.3d 570, 577 (3d Cir. 2005).

## A.

It is well-settled under the Restatement (Second) of Contracts (the Restatement) that mutual assent between parties is necessary for the formation of a contract. See Restatement § 17; see also Univ. of V.I. v. Petersen-Springer, 232 F. Supp. 2d 462, 469 (D.V.I. 2002) ("[T]he formation of a contract requires 'a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.'") (quoting Restatement § 17). While mutual assent "is sometimes referred to as a 'meeting of the minds,'" Restatement § 17 cmt. c, this phrase must not be construed too literally. Acceptance is measured not by the parties' subjective intent, but rather by their outward expressions of assent. As the Restatement explains:

4

The parties to most contracts give actual as well as apparent assent, but it is clear that a mental reservation of a party to a bargain does not impair the obligation he purports to undertake. The phrase used here, therefore, is "manifestation of mutual assent."

Id.

The Supreme Court has observed: "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." Upton v. Tribilcock, 91 U.S. 45, 50 (1875). The "integrity of contracts demands" that this principle "be rigidly enforced by the courts." 1 Richard A. Lord, Williston on Contracts § 4:19 (4th ed. 2008). As one noted treatise explains:

According to the objective theory of contract formation, what is essential is not assent, but rather what the person to whom a manifestation is made is justified as regarding as assent. Thus, if an offeree, in ignorance of the terms of an offer, so acts or expresses itself as to justify the other party in inferring assent, and this action or expression was of such a character that a reasonable person in the position of the offeree should have known it was calculated to lead the offeror to believe that the offer had been accepted, a contract will be formed in spite of the offeree's ignorance of the terms of the offer. The most common illustration of this principle is the situation when one who is ignorant of the language in which a document is written, or who is illiterate, executes a writing proposed as a contract under a mistake as to its contents. Such a person is bound, in the absence of fraud, if the person does not require the document to be read to him . . . .

Id. See New York Life Ins. Co. v. Kwetkauskas, 63 F.2d 890, 891 (3d Cir. 1933) (recognizing that "[i]t is true that an illiterate man may bind himself by contract by negligently failing to learn the contents of an instrument which he has executed"); Hoshaw v.

5

Cosgriff, 247 F. 22, 26 (8th Cir. 1917) (holding that every contracting party has the duty "to learn and know the contents of a contract before he signs and delivers it"). Arbitration agreements in the employment context are not exempt from this principle. See, e.g., Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94, 101 (D.D.C. 2004) (stating that "[f]ailure to read or understand an arbitration agreement, or an employer's failure to explain it, simply will not constitute 'special circumstances' warranting relieving an employee from compliance with the terms of an arbitration agreement that she signed").

Morales, in essence, requests that this Court create an exception to the objective theory of contract formation where a party is ignorant of the language in which a contract is written. We decline to do so. In the absence of fraud, the fact that an offeree cannot read, write, speak, or understand the English language is immaterial to whether an English-language agreement the offeree executes is enforceable. See Paper Express, Ltd. v. Pfankuch Maschinen, 972 F.2d 753, 757 (7th Cir. 1992) (addressing a contract dispute between an Illinois corporation and a German corporation and holding that parties should be held to contracts, even if the contracts are in foreign languages or the parties cannot read or understand the contracts due to blindness or illiteracy); Shirazi v. Greyhound Corp., 401 P. 559, 562 (Mont. 1965) (holding Iranian student subject to limitation contained in baggage receipt and stating that "[i]t was incumbent upon [the plaintiff], who knew of his own inability to read the English language, to acquaint himself with the contents of the ticket"); Paulink v. Am. Express Co., 163 N.E. 740, 741 (Mass. 1928) (stating that "plaintiff was bound by the[] terms [of foreign bills of exchange], in the absence of deceit on the part of the defendant, even though not understanding their purport and ignorant of the English language"); Wilkisius v. Sheehan, 156 N.E. 5, 6 (Mass. 1927) (holding that Lithuanian husband and wife, who did not speak or understand English and used an interpreter to contract for an exchange of real estate, were bound by the terms of the agreement because "their failure to understand these details was not due to fraudulent acts on the part of the defendant but to their own inability to read, write,

6

speak or understand the English language, and to the incapacity of the interpreter").

Morales is not claiming fraud, see App. 78, 95, and he is not alleging that Sun misrepresented the contents of the Agreement to him. Cf. Am. Heritage Life Ins. Co. v. Lang, 321 F.3d 533, 538 (5th Cir. 2003) (recognizing that "[i]t is a widely accepted principle of contracts that one who signs or accepts a written instrument will normally be bound in accordance with its written terms," and that a defendant, "illiterate or not, would be bound by the terms of the arbitration agreements," but remanding for adjudication of a claim of fraud in the inducement); Pimpinello v. Swift & Co., 253 N.Y. 159, 163 (1930) (stating that "[i]f the signer is illiterate, or blind, or ignorant of the alien language of the writing, *and the contents thereof are misread or misrepresented to him* by the other party . . . unless the signer be negligent, the writing is void") (emphasis added).[1] Further, there is no evidence that Sun tried to hide the arbitration clause; indeed, it comprised about one-half of the Agreement.

It was Morales' obligation to ensure he understood the Agreement before signing. Morales did not ask Hodge to translate the document word-for-word or ask to take the Agreement home and have it translated, notwithstanding the fact that he testified that, in the past, he had paid someone to translate documents for him. App. 32-33. Morales did not even request a copy of the employment contract, a demand Sun has indicated it would have granted without dispute. App. 84. Moreover, in the almost one year that Morales worked for Sun, he never questioned the terms of the Agreement. Morales' signature manifested his assent to the

---

[1]The dissent analogizes this case to American Heritage Life Insurance Company v. Lang. Unlike Morales, however, the illiterate plaintiff in Lang asked the defendant's agent to explain each of the documents Lang signed, and he submitted evidence that the agent deliberately mislead him as to what he was signing by claiming that the papers were loan or insurance documents rather than an arbitration agreement.

7

entire Agreement, and he is bound by the arbitration clause therein.[2]

## B.

Sun also asserts that the District Court improperly applied a heightened standard of "knowing consent" to the Agreement's arbitration clause because of the valuable rights relinquished under the provision. Sun contends that, contrary to ordinary contract law principles, the District Court required that Morales have knowledge and understanding of the arbitration clause's terms in order for the provision to be enforceable. While it is unclear whether the District Court indeed took such action, we reiterate our holding in Seus v. John Nuveen & Co., Inc., 146 F.3d 175 (3d Cir. 1998), overruled on other grounds by Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000), that applying a heightened "knowing and voluntary" standard to arbitration agreements would be inconsistent with the FAA. See Seus, 146 F.3d at 183-84 (explaining that a "knowing and voluntary"

_____

[2]We disagree with the dissent's characterization of the circumstances in this case. The dissent suggests that "Sun assigned Hodge . . . to translate the [Agreement] for Morales; [ ] Hodge . . . neglected to translate the arbitration clauses; and [ ] as a result of Hodge's incomplete translation, Morales was not aware that the Agreement contained an arbitration clause." Dissent at 3. Sun requested that Hodge assist Morales in completing the pre-hire documents. Morales did not ask Hodge for an explanation of the Agreement, and Hodge testified that if Morales had asked questions, he "would have translated to him what [a specific] page [was] for." App. 90. Indeed, Morales initialed each page of the Agreement, including those containing the arbitration provisions, without requesting any specific translations. See App. 126-38.

While we are sympathetic to Morales' situation, Hodge did not misread or misrepresent the Agreement to Morales, and the "incomplete translation" was due to Morales' failure to request any explanation or translation. Furthermore, we reiterate that Morales worked under this Agreement for almost a year without question or complaint.

8

standard meaning "more than with an understanding that a binding agreement is being entered and without fraud or duress" should not be applied to arbitration agreements). Morales entered into the Agreement with Sun without fraud or duress, and he is bound by its arbitration clause.

IV.

For the foregoing reasons, the judgment of the District Court will be reversed and the case remanded for the District Court to enter a stay pending arbitration.

FUENTES, <u>Circuit Judge</u>, dissenting.

No one disputes that Sun asked Hodge to translate the Employment Agreement for Morales, who did not read English. And no one disputes that Hodge failed to translate the arbitration clause in the Agreement. On this basis, I disagree with my colleagues' conclusion that the parties here manifested mutual assent to the arbitration clause of the Agreement, and I would therefore affirm the District Court's decision.[3]

The majority opens its opinion by asserting that this case "requires us to determine whether an arbitration clause is enforceable where one party is ignorant of the language in which the agreement is written." Maj. Op. at 2. The problem, however, is not simply Morales' ignorance of the language. The gravamen of this case is that Sun – the other party to the Agreement – took upon itself the task of translating the Agreement for Morales and, in doing so, failed to convey the entire contents of the Agreement. What we must determine is whether this failure resulted in a lack of mutual assent; I believe that it did.

The law is clear that a party may not be relieved of his or her obligations pursuant to a contract solely because he or she cannot understand the language in which that contract is written. However, the law is also clear that there are certain circumstances where a person's inability to comprehend the language in which a contract is written may result in a lack of mutual assent. In fact, the very cases upon which the majority relies acknowledge that such circumstances exist. For example, in <u>New York Life Insurance Co. v. Kwetkauskas</u>, we noted that "an illiterate man may bind himself by contract by <u>negligently</u> failing to learn the contents of an instrument which he has executed,"

---

[3] I join the majority in its affirmance of our ruling in <u>Seus v. John Nuveen & Co., Inc.</u>, 146 F.3d 175 (3d Cir. 1998), that it would be inconsistent with the Federal Arbitration Act to apply a heightened "knowing and voluntary" standard to arbitration agreements.

suggesting that a person who had not acted negligently may not be so bound.  63 F.2d 890, 891 (3d Cir. 1933) (emphasis added). Similarly, in <u>Booker v. Robert Half International, Inc.</u>, the court stated that failure "to read or understand an arbitration agreement, or an employer's failure to explain it, simply will not constitute 'special circumstances' [that] warrant[] relieving an employee from compliance with the terms of an arbitration agreement that she signed," suggesting that "special circumstances" do exist.  315 F. Supp. 2d 94, 101 (D.D.C. 2004) (emphasis added).

The majority appears to agree that there can be such "special circumstances," but suggests that these circumstances exist <u>only</u> in a case where a fraud has been perpetuated.  Maj. Op. at 7. I do not think that this is correct.  In <u>New York Life</u>, the court noted that an illiterate signer will be held to a contract if he or she negligently failed to learn its contents; it does not automatically follow that an illiterate signer who is unaware of the contents of a contract but did <u>not</u> act in a negligent fashion will similarly be held to that contract unless he or she was a victim of fraud.  63 F.2d at 891.  In <u>Pimpinello v. Swift & Co.</u>, another case cited by the majority, the court found that if a signer is "illiterate, or blind, or ignorant of the alien language of the writing" and the contents of a contract "are <u>misread or misinterpreted</u> to him" or her, the writing would be considered void unless the signer had acted negligently. 253 N.Y. 159, 163 (1930) (emphasis added).  The court did not suggest that the contents would need to be <u>intentionally</u> "misread or misinterpreted" in order to void the writing.

More recently, in <u>American Heritage Life Insurance Co. v. Lang</u>, the Fifth Circuit considered similar facts as those here. 321 F.3d 533 (5th Cir. 1993).  In <u>Lang</u>, also cited by the majority, an illiterate man executed a series of loans with a representative of an insurance company.  <u>Id.</u> at 535.  The representative was aware that the man was unable to read, and took on the task of explaining each document to him.  <u>Id.</u> at 536.  The man later testified that the representative never explained that some of the documents were arbitration agreements, and brought suit charging both that the arbitration clause was invalid and that the representative had

defrauded him.  Id.  The Lang court addressed the questions of mutual assent and fraud separately.  It noted that while illiteracy alone is not a sufficient basis for the invalidation of an arbitration agreement, the man's "alleged ignorance of the fact that he was signing arbitration agreements signifies that he may not have consented to them and a meeting of the minds may not have existed."  Id. at 538; see also id. at 539 (concluding that "there [was] sufficient evidence to indicate that the arbitration agreements may not have been valid under ordinary contract principles," including the principle that both parties must manifest mutual assent).  While the case was ultimately remanded so that the district court could reconsider the claim of fraud, the remand did not affect the court's separate observation that a "meeting of the minds" may not have not occurred.  Id. at 539.

Here, although Morales does not allege that Sun acted fraudulently, he does allege that Hodge, who was translating the document at Sun's direction, failed to inform Morales that the Agreement contained an arbitration clause.  Importantly, Sun does not dispute the following factual findings made by the District Court:  (1) Morales was unable to read the contract; (2) Sun assigned Hodge, a coworker who himself was not fluent in English, to translate the document for Morales; (3) Hodge, in translating the document, neglected to translate the arbitration clauses; and (4) as a result of Hodge's incomplete translation, Morales was not aware that the Agreement contained an arbitration clause. (App. 3-5.)  I also note, as does the majority, that the record demonstrates that Sun was under pressure to hire Morales in an expedient manner, and urged him to accept Hodge's translation and to sign the Agreement immediately.  Maj. Op. at 3.

As in Lang, Morales did not read English and Sun was aware of his inability to understand the contents of the Agreement.  As in Lang, Sun also represented that it (via Hodge) would explain what was contained in the Agreement.  And as in Lang, Morales' failure to realize that an arbitration provision was contained within the Agreement was the direct result of Hodge's failure to properly translate the document, just as the failure of the

12

plaintiff in <u>Lang</u> to realize he had signed an arbitration provision was because the representative didn't inform him of that fact. Neither Morales nor the plaintiff in <u>Lang</u> was aware of what they <u>did not</u> know about the contract, and not because they could not read English and acted negligently by not bothering to learn the terms of the contract; but because the translation they were presented with by <u>the other party to the contract</u>, which they had no reason to suspect and no immediate way to verify, was incorrect or incomplete.[4]

If the facts of this case were different, I might adopt the majority's position. For example, if Sun had simply handed the Agreement to Morales and indicated that it was Morales' responsibility to find a translator, and Morales had employed a incompetent translator who failed to translate the arbitration clause, I would agree that Morales was bound by the Agreement. However, when Sun made the decision to insert itself between Morales and the contract, it created a situation where lack of mutual assent could, and did, occur.[5] Because I do not believe it was negligent or otherwise improper for Morales to rely upon the translation provided by Sun, and because Morales was not informed in the course of that translation that the Agreement contained an arbitration clause, I agree with the District Court that Morales did not "manifest an intention" to be bound by the arbitration clause.

---

[4] The majority notes that Morales "worked under the Agreement for almost a year without complaint." Maj. Op. at 8 n.2. This fact is irrelevant to the analysis. Until there was an employment dispute between Morales and Sun, Morales had no reason to review the Agreement to determine whether it contained clauses that had not originally been translated for him.

[5] The majority opinion regrettably provides no incentive for employers such as Sun to implement procedures that might avoid such a situation.

11

For the foregoing reasons, I respectfully dissent.